**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**JONESBORO DIVISION**

ROBERT C. HOWARD PLAINTIFF

v. No. 3:14CV00202 JLH

NUCOR-YAMATO STEEL COMPANY DEFENDANT

**OPINION AND ORDER**

This is a negligence case. Robert C. Howard was injured at a Nucor-Yamato Steel Company facility during the process of loading a heavy object onto his flatbed trailer. He alleged that while he was attempting to position dunnage on the trailer, Nucor's overhead crane struck the dunnage and caused him to fall from the trailer. Nucor denied that the crane struck the dunnage and contended that Howard fell due to his own negligence. A jury found that there was negligence on the part of Nucor and on the part of Howard, attributing 87 percent of responsibility to Nucor and 13 percent of responsibility to Howard. Document #48. The jury found that Howard was damaged in the amount of $331,600. Pursuant to the jury verdict, the Court entered judgment in favor of Howard against Nucor in the amount of $288,492. Nucor has filed a renewed motion for judgment as a matter of law and, in the alternative, a motion for a new trial pursuant to Federal Rule of Civil Procedure 50(b). Document #70. For the following reasons, Nucor's motion is denied.

Howard was a truck driver. On June 27, 2011, he drove from his home in Paducah, Kentucky, to the Nucor plant in Blytheville, Arkansas, in order to pick up an arbor, which is a cylindrical steel object (also called a roll), weighing approximately 38,500 pounds, approximately 16 feet in length and 43 inches in diameter, and which is used in the steel mill to press hot steel. Howard signed in upon arrival at the plant and learned that he was to back his truck into door eleven and wait for Nucor employees to bring the arbor to the trailer. Nucor employees Scott Norris and

Joey Summers were responsible for helping Howard load the arbor. Norris operated the crane from which the arbor was suspended. Howard was responsible for "staging up" before the arbor was loaded, which means he had to get the dunnage ready. Dunnage–wooden beams or railroad ties–is used to build cradles for large equipment. Howard testified that his normal procedure involved Nucor employees moving the load over the trailer, so that he could determine where the load should be positioned relative to the front and rear ends of the trailer. Then, Nucor employees generally would move the load over to the side and Howard would arrange his dunnage in two places perpendicular to the sides of the trailer so that the arbor could rest on the dunnage and be strapped down securely. After the dunnage was arranged, the load would be moved back to the desired position, set, and strapped in preparation for transportation.

While positioning his dunnage on the day of the accident, Howard fell from the trailer and fractured his calcaneus–heel bone. The fracture-line extended from the heel into one of the small joints in the foot called the subtalar joint, which is loaded with weight each time someone takes a step. Doctor Frederick Day treated Howard in the emergency room. He testified at trial via video deposition that the type of injury Howard sustained was a life-changing injury, even with a successful procedure to restore the joint to its proper alignment. Doctor Day performed such a procedure–an open reduction internal fixation–on Howard. He used wires, 76 screws, and a plate to stabilize Howard's heel bone. Doctor Day provided follow-up treatment to Howard until Howard decided to transfer his care to Doctor Burton Stodghill, who also testified at trial via video deposition. Doctor Stodghill reiterated that a calcaneal fracture is a life-changing injury because it increases the chances of developing subtalar osteoarthritis and testified that he believed to a reasonable degree of medical certainty that Howard would have problems with subtalar osteoarthritis

and ambulation for the rest of his life. He testified that Doctor Day did a good job of restoring the heel but that even if you can get a subtalar joint anatomically aligned, the damage is done at the time of the fracture. Doctor Stodghill eventually performed an operation to remove the plate installed by Doctor Day because Howard complained of pain around the area of the incision. In January 2014, Doctor Stodghill noted osteoarthritic changes within the subtalar joint. He opined that there was a high probability that Howard would never experience another pain-free step.

**I.**

Judgment as a matter of law can be granted only if a reasonable jury would have no legally sufficient evidentiary basis to find for Howard. *Luckert v. Dodge County*, 684 F.3d 808, 817 (8th Cir. 2012) (citing FED. R. CIV. P. 50(a)). "A jury verdict should not be overturned unless there is a complete absence of facts to allow a jury to reach its conclusion." *Madden v. Lumber One Home Center, Inc.*, 745 F.3d 899, 902-03 (8th Cir. 2014) (quoting *Wilson v. Brinker Int'l, Inc.*, 382 F.3d 765, 770 (8th Cir. 2004)). "[J]udgment as a matter of law is proper when the record contains no proof beyond speculation to support the verdict." *Heating & Air Specialists, Inc. v. Jones*, 180 F.3d 923, 932–33 (8th Cir.1999) (internal quotation marks omitted). In considering Nucor's motion, the Court must give Howard the benefit of all reasonable inferences, assume as proven all facts that his evidence tended to show, and assume that all conflicts in the evidence were resolved in his favor. *See Henderson v. Simmons Foods, Inc.*, 217 F.3d 612, 615 (8th Cir. 2000). The Court must consider evidence presented in favor of Howard during Nucor's case in ruling on the renewed motion for judgment as a matter of law. *See, e.g.*, *Auto Transport v. Potter*, 197 F.2d 907, 908-09 (8th Cir. 1952) ("The defendants presented a motion for a directed verdict in their favor for insufficiency of the evidence at the close of all the evidence which was overruled, and on this appeal all evidence

submitted by both the plaintiff and the defendants must be considered in determining whether or not a submissible case was made.”). *See also Potti v. Duramed Pharmaceuticals, Inc.*, 938 F.2d 641, 645 (6th Cir. 1991); *Bill Fitts Auto Sales, Inc. v. Daniels*, 325 Ark. 51, 58, 922 S.W.2d 718, 722 (Ark. 1996) (“If, after the denial of a request for a directed verdict or a dismissal, a defendant introduces evidence which, together with that introduced by the plaintiff, is legally sufficient to sustain a verdict, he waives his claim of error by the court in refusing to direct a verdict, or dismiss, at the close of the plaintiff’s case.”); 9B ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2534 (3d ed. 2015).

During a three-day trial, both sides presented the jury with extensive testimony along with several demonstrations to show how Howard fell from his flatbed trailer. Jurors heard three versions of what happened from Norris, Summers, and Howard.

Norris was an experienced crane operator, but he did not routinely load trailers, did not know the manner in which Howard planned to proceed, and did not have experience with the type of loading system Howard planned to use. Nucor policy required Norris to call a meeting to discuss loading the trailer since it was not a routine load, but he failed to do so.

Norris testified that, using the crane, he first moved the arbor over what he thought was the center of the trailer. Then, he spoke with Howard to ask where he wanted the arbor to be set. Howard stood on the ground with Norris and helped him position the arbor relative to the length of the trailer. Then, Howard climbed up onto the trailer to help Norris position the arbor relative to the width of the trailer. Norris agreed that it was a violation of Nucor policy to move the arbor while Howard was on the trailer. According to Norris, the arbor remained suspended some 12 to 18 inches above the center of the trailer while Howard attempted to move his dunnage in place. Norris testified

that his eyes were on the arbor–which he contends was motionless–and that he did not see Howard fall. At some point, while Norris was watching the arbor suspended over the trailer, he saw Howard's feet moving in his peripheral vision. Norris testified that when he saw Howard's feet underneath the arbor, he hit the emergency stop. According to Norris, he hit E-stop even though the arbor was motionless just to verify that it would not move anymore. One or two seconds later Norris heard Summers shout but is not sure what he said. Norris realized that Howard fell when Summers told him so. Then, he went around the trailer to where Howard had fallen. According to Norris, Howard stated that the crane operator knocked him off. Norris did not object to the statement at the time, given the circumstances, but testified at trial that he did not knock Howard off the trailer.

Summers testified that when Norris finished positioning the arbor above the trailer, he saw Howard pick up his dunnage, which was lying at the front of the trailer, and begin to drag it toward the rear of the trailer. Summers previously thought that Howard would position his dunnage from the ground by reaching up onto the trailer. Howard needed to position the dunnage perpendicular to the edge of the trailer, which would require him to place it directly under the suspended arbor. Summers admitted that it was unsafe to attempt to position the dunnage in such a manner, but he did not say anything to Howard. When Howard started moving toward the arbor, Summers looked at Norris for a couple seconds to make sure he hit the E-stop. Summers wanted to verify that the crane was not moving, in case anything happened. When Summers looked back toward Howard, he saw Howard's feet getting closer to the edge as Howard walked sideways down the length of the trailer. Summers shouted to watch out and then saw Howard's hands fly up as he stepped off the trailer. Summers went around to check on Howard, who stated that the crane operator knocked him off. Summers did not argue because he knew Howard was in pain.

According to Howard, Norris used the crane to position the arbor over the trailer at the appropriate point relative to the trailer's length but then moved the arbor over to the side, away from the trailer, so that Howard could position the dunnage. Then, he grabbed the dunnage, which was laying at the front of the trailer, held one end at waist-level and dragged it toward the rear of the trailer. At some point, it began to feel heavy, snapped out of his hands, and he fell backward. Howard landed on his foot. He pulled himself up, looked over the trailer, saw the arbor suspended over the dunnage, and then collapsed. Howard testified that he was surprised because the arbor had been over to the side of the trailer when he began to move the dunnage and he had not seen it move back to a point above the trailer. According to Howard, Norris came to him and said that he had fallen from the trailer and Howard replied: "No, I didn't. The crane operator knocked me off." During the trial, Howard pointed to Norris, identifying him as the Nucor employee who suggested that he fell off the trailer.

Ed Cable–a Nucor supervisor–interviewed Norris and Summers and prepared an incident report after Howard's fall in which he recorded that a cause of or a contributing factor to the accident was that Howard was not wearing a reflective vest. The purpose of a reflective vest is to be seen clearly. Howard's not wearing a reflective vest could have contributed to or caused the accident only if Norris did not see Howard dragging the dunnage down the trailer and therefore engaged the crane to move the arbor. Cable testified that the consensus among the employees on the scene at the time of the accident, i.e., Norris and Summers, was that Nucor had knocked Howard off the trailer.

In short, the most compelling evidence was the immediate reaction of the three persons who were present at the time of the accident. It is undisputed that Howard's immediate, unpremeditated,

spontaneous reaction was that the crane operator knocked him off the trailer. Likewise–according to Cable–Norris and Summers believed immediately after the accident that Nucor had knocked Howard off the trailer–hence his report that the absence of a reflective vest contributed to or caused the accident. Based on the immediate perception of every participant in the accident at the time it occurred, the jury was entitled to believe that movement of the crane knocked Howard off the trailer.

Despite this compelling evidence, Nucor argues that it was impossible for a movement of the crane to have knocked Howard off the trailer. That argument is based upon estimates by Howard as to how far he had dragged the dunnage from the front of the trailer toward the back before he fell off and where the arbor had been located vis-a-vis the front and rear of the trailer. Using those estimates, Nucor argues that it was impossible for the accident to have occurred in the manner that Howard said. The jury was not limited to considering Howard's testimony. Rather, the jury was entitled to consider all of the evidence, including the admission by Cable that Nucor's employees at the scene thought that Nucor had knocked Howard off the trailer. Furthermore, according to Norris, he saw Howard's feet under the arbor, hit the emergency stop, and almost immediately thereafter heard Summers yell in relation to Howard's fall. Based on that testimony, the jury could have concluded that Howard had not dragged the dunnage past the arbor when he fell from the trailer. Rather, based on Norris' testimony, the jury reasonably could have concluded that Howard was adjacent to the arbor when he fell. In addition, Howard testified that when he began dragging the dunnage from the front of the trailer toward the rear, the arbor had been moved to the side and was no longer above the trailer. According to Norris and Summers, when Howard fell, the arbor was directly above the center of the trailer. And, according to Howard, after he fell, he pulled himself up and saw the arbor suspended above the trailer. If all of that testimony is true, as the jury was

entitled to believe, they jury could have inferred that the arbor was moved to the side of the trailer and then moved back over the trailer while Howard was on the trailer moving his dunnage.

In addition to this evidence, it is undisputed that Nucor's policy required the crane operator to call a meeting to discuss how the trailer would be loaded if it was not a routine matter. Norris did not routinely load trailers and did not know how Howard intended to position his dunnage and load the arbor. According to Nucor policy, he should have called a meeting. The jury was entitled to consider that evidence and conclude that Norris' failure to call a meeting was negligent and that that negligence was a cause of the accident. Furthermore, Summers testified that he saw that Howard was in a dangerous position moving the dunnage while the arbor was suspended over the trailer, but he did not intervene to warn Howard until immediately before the fall. The jury was also entitled to conclude that Summers' failure to warn Howard that he was approaching the edge of the trailer and about to fall was negligence that was a cause of the accident.

In short, substantial evidence supports the jury verdict.

**II.**

Federal Rule of Civil Procedure 50(b) provides that a party filing a renewed motion for judgment as a matter of law may include an alternative request for a new trial under Rule 59, which allows the Court to grant a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court." A court may grant a new trial pursuant to Rule 59 "if it is satisfied that a jury verdict will work a substantial injustice if permitted to stand." *Pitts v. Electro-Static Finishing, Inc.*, 607 F.2d 799, 804 (8th Cir. 1979). Nucor argues that the Court should grant a new trial for three reasons: The jury's verdict was against the weight of the evidence; the Court erred by failing to give jury instructions proffered by Nucor; and the jury witnessed Howard's

family members helping him down the stairs during a fire alarm, which was unfairly prejudicial to Nucor. Document #71 at 2.

**A. Weight of the Evidence**

The standard for granting a new trial based on the weight of the evidence is different from the standard for granting judgment as a matter of law. *White v. Pence*, 961 F.2d 776, 779-80 (8th Cir. 1992). The Court has broad discretion to grant a new trial. *See id*. "In passing on a motion for a new trial premised on the weight of the evidence, the district court may rely on its own reading of the evidence and grant a new trial even where substantial evidence exists to support the verdict." *Dominium Mgmt. Serv., Inc. v. Nationwide Hous. Grp.*, 195 F.3d 358, 366 (8th Cir. 1999). The Court may weigh conflicting evidence but need not view that evidence in the light most favorable to the nonmovant and it may disbelieve witnesses. *White*, 961 F.2d at 780. However, "the district court is not 'free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable.'" *White*, 961 F.2d at 780 (quoting *Fireman's Fund Ins. Co. v. Aalco Wrecking Co., Inc.*, 466 F.2d 179, 186 (8th Cir. 1972)). For the reasons explained above, the verdict was not against the weight of the evidence so as to constitute a miscarriage of justice.

**B. Jury Instructions**

Federal Rule of Civil Procedure 51(d) provides that a party may assign as error a failure to give an instruction, if that party properly requested it and–unless the court rejected the request in a definitive ruling on the record–also properly objected. Reversal is only warranted if the failure to give its requested instructions misled the jury or had a probable effect on the verdict. *Taylor v. Dormire*, 690 F.3d 898, 900 (8th Cir. 2012). *See also* 11 MARY KAY KANE, FEDERAL PRACTICE AND

PROCEDURE § 2805 (3d ed. 2015) ("[I]t is only those errors that have caused substantial harm to the losing party that justify a new trial."). A district court has broad discretion in instructing the jury. *B & B Hardware, Inc. v. Hargis Indus., Inc.*, 252 F.3d 1010, 1012 (8th Cir. 2001). Nucor argues that it proffered four appropriate instructions and that the Court erred in failing to give those instructions. Document #71 at 7. The Court did not err by failing to give the four instructions proffered by Nucor, but even if it did err, the failure to give the instructions did not harm Nucor. FED. R. CIV. PRO. 61.

Nucor contends that the Court erred by not giving instructions to the effect that Howard violated laws and regulations by taking Lortab on the day of the accident. The evidence reflected that Howard took one Lortab[1] around 4:00 a.m. the morning of the incident. The incident occurred ten hours later around 2:00 p.m. Nucor failed to provide evidence tending to show that Howard was impaired by Lortab at anytime, let alone ten hours after he consumed it. Howard spoke to at least three different Nucor employees on that day, none of whom testified that Howard appeared to be impaired. Likewise, nothing in the hospital records suggests that Howard was in anyway impaired when he was admitted.

The instructions that Nucor proffered on the impairment issue were based on Arkansas Model Instruction 601, which provides a framework for the Court to instruct the jury that the violation of a relevant statute, regulation, or ordinance is evidence of negligence. A party is entitled to this instruction only when there is some basis in the evidence to support giving the instruction to the jury. *McMickle v. Griffin*, 369 Ark. 318, 322, 254 S.W.3d 735, 740 (2007). Nucor asked the

---

[1] Lortab is a combination of acetaminophen and hydrocodone. *See Lortab*, PHYSICIANS' DESK REFERENCE, http://www.pdrhealth.com/drugs/lortab (last visited Feb. 22, 2016).

Court to instruct the jury that violations by Howard of ARK. CODE ANN. § 23-13-258, 49 C.F.R. § 392.4, 49 C.F.R. § 391.41, and 49 C.F.R. § 382.213(b) are evidence of negligence. The statute and Department of Transportation regulations each involve the use of certain substances while operating a commercial vehicle or performing safety sensitive functions while on duty. ARK. CODE ANN. § 23-13-258 provides that it is unlawful to possess, consume, or be under influence of any controlled substance while operating or in physical control of a motor vehicle. Because Howard was not operating or in physical control of a motor vehicle at the time of the accident, no evidence supported an instruction based on this statute.

Forty-nine C.F.R. § 392.4 provides that no driver shall be on duty and possess, be under the influence of, or use a narcotic drug or any derivative thereof; or any other substance, to a degree which renders the driver incapable of safely operating a motor vehicle. Nucor argues that it was entitled to the instruction because the evidence shows that Howard was in violation of the regulation on the day of the incident. Nucor argues that the proper interpretation of 392.4 makes it unlawful for a driver to possess, be under the influence of, or use, a narcotic drug or any derivative thereof; the clause "to a degree which renders the driver incapable of safely operating a motor vehicle," only applies to "[a]ny other substance." This may be true; the regulation has been interpreted in this manner. *See Toledo v. Nobel-Sysco, Inc.*, 892 F.2d 1481, 1490 (10th Cir. 1989). But there is no evidence that Howard possessed, was under the influence, or was using Lortab at the time of the accident. As mentioned, he admittedly used Lortab ten hours before the accident, but he testified that he had none with him and no evidence showed that he was under the influence when the accident occurred.

Nucor also argues that Howard was in violation of the regulation because he was not advised by a licensed medical practitioner that Lortab would not affect his ability to drive his truck. Section 392.4(c) provides that there is no violation when a narcotic is administered to a driver under the instructions of a licensed medical practitioner, who has advised the driver that the substance will not affect the driver's ability to safely operate a motor vehicle. A licensed medical practitioner administered Lortab to Howard but a chiropractor conducted his D.O.T. physical and found that he was qualified for a license, though he took Lortab. "Licensed medical practitioner means a person who is licensed, certified, and/or registered, in accordance with applicable Federal, State, local, or foreign laws and regulations, to prescribe controlled substances and other drugs." 49 C.F.R. § 382.107. Chiropractors are not permitted to prescribe controlled substances in the state of Kentucky, where Howard visited a chiropractor for his D.O.T. physical. KY. REV. STAT. ANN. § 312.017(1)(f) (West 2015). The purpose of section 392.4 is to ensure that drivers are not driving while impaired by narcotics. No evidence showed that Howard was impaired at the time of the accident nor that his use of Lortab caused or contributed to the accident. The facts of this case do not suggest that the distinction between a chiropractor and a licensed medical practitioner had anything to do with the accident. Drawing the jury's attention to the regulation would have served only as an irrelevant distraction and would have no probable effect on the verdict. The Court did not err in failing to incorporate 49 C.F.R. § 392.4 into Arkansas Model Instruction 601. But even if the Court did err, failing to give the instruction did not cause substantial harm to Nucor. The same reasoning applies to § 391.41 and § 382.213(b), which similarly proscribe the use of narcotics while operating a commercial motor vehicle.

Nucor also points to a hospital laboratory report indicating that Howard tested positive for hydromorphone sometime after being admitted to the emergency room. The record reflects that the test was ordered on July 27, 2011, at 6:25 p.m. Results were received on July 29, 2011, at 12:05 a.m., and reported on August 1, 2011, at 3:08 p.m. The laboratory report says that Howard was negative for amphetamines, barbituates, benzodiazepines, cocaine metabolite, PCP, and THC but positive for opiates at 3631 NG/ML for hydrocordone and positive at 427 NG/ML for hydromorphone. Next to the report of positive for opiates, a handwritten note states that Howard received Hydrocodone in the emergency room. Nucor did not provide testimony at trial to explain the significance of the drug screening in relation to whether Howard was impaired when the accident occurred. Nucor's argument assumes that the laboratory report, standing alone, is sufficient evidence to enable a jury to find that Howard was impaired at the time of the accident, but that assumption is mistaken. The laboratory report, standing alone, does not explain the significance of finding hydromorphone in Howard's system after he had been given hydrocodone in the emergency room. According to a recent article in the *Journal of Toxicology*, hydromorphone is a metabolite of hydrocodone. "After administration of hydrocodone, 5-6% of the dose is recovered in urine as hydromorphone and conjugated hydromorphone . . . . Hydromorphone . . . is itself marketed as Dilaudid for the management of severe pain." Neveen H. Barakat et al., *Relationship between the Concentration of Hydrocodone and its Conversion to Hydromorphone in Chronic Pain Patients Using Urinary Excretion Data*, 36 JOURNAL OF ANALYTICAL TOXICOLOGY 257, 257 (2012). Without expert testimony to explain the laboratory report, the relationship between hydrocodone and hydromorphone, and the significance of the positive result for hydromorphone, there was no basis

for giving an instruction that assumed that evidence existed to show that Howard was under the influence of hydromorphone at the time of the accident.

Nucor also proffered Arkansas Model Instruction 301, which provides the definition of fault. Nucor correctly notes that this instruction is to be used when the term "fault" is used in another instruction. However, the instructions did not use the term "fault." Rather, they used the terms "negligence" and "ordinary care," so those terms were defined pursuant to the Arkansas Model Instructions. It was not error to fail to provide the jury with the definition of fault.

In addition, Nucor proffered Arkansas Model Instruction 307, which defines assumption of risk. Nucor argues that "there is no question that Howard voluntarily climbed onto the trailer and directed the entire loading process which he claims lead to his fall." The instruction should be used only when comparative fault based on assumption of risk is an issue. Assumption of risk it not a separate theory; it has been subsumed under Arkansas law into the definition of fault. ARK. CODE ANN. § 16-64-122. Here, the Court instructed the jury pursuant to the Arkansas Model Instructions on the definitions of negligence and ordinary care. The Court also explained that Nucor contended there was negligence on the part of Howard and the interrogatories allowed for the jury to apportion responsibility based on Howard's comparative negligence. Thus, the instructions covered Nucor's theory of the case–that Howard fell due to his own negligence. "It is not error for the trial court to refuse a proffered jury instruction when the stated matter is correctly covered by other instructions." *Ouachita Wilderness Inst., Inc. v. Mergen*, 329 Ark. 405, 417, 947 S.W.2d 780, 786 (1997). Therefore, the Court was not obligated to give an instruction on assumption of risk. *See Mergen*, 329 Ark. at 417, 947 S.W.2d at 786.

Finally, Nucor proffered an instruction defining the term "disability" for purposes of social security benefits, arguing that the instruction was needed because Howard was receiving Social Security benefits at the time of the accident.[2] The jury had no issue before it that required such an instruction. Including the definition of "disability" would not have assisted the jury in determining whether or the extent to which Howard's own negligence contributed to his injury, nor would it have assisted the jury in determining the amount of Howard's damage. All of the evidence offered as to Howard's medical condition on the day of and prior to the accident was received. Instructing the jury on the definition of disability for Social Security purposes would not have assisted the jury in any way. Therefore, this Court did not err by failing to define the term "disability" to the jury.

**C. Unfair Prejudice**

Finally, Nucor argues that the passions of the jurors were inflamed as they witnessed Howard being helped out of the building during a fire alarm. Document #71 at 6. And as a result, they were unfairly prejudiced against Nucor in deciding liability and damages. *Id*. As pointed out by Howard, jurors routinely witness injured plaintiffs entering the courthouse and moving about the courtroom. Document #76 at 10. If Nucor believed the issue to be prejudicial, it was obligated to move for a mistrial. *See, e.g., Sanden v. Mayo Clinic,* 495 F.2d 221, 227 (8th Cir. 1974) (holding that a new trial was not warranted where defense counsel repeatedly spoke too loudly during bench conferences, stating: "There was no motion for a mistrial at the time of the bench colloquy . . ."). *See also* 11 MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2805 (3d ed. 2015) ("A principal that strikes very deep is that a new trial will not be granted on grounds not called to the

---

[2] Evidence was introduced that Howard was receiving Social Security benefits and that he had been earning in excess of the maximum amount allowed to persons receiving those benefits.

court's attention during the trial unless the error was so fundamental that gross injustice would result."). The jury and the parties returned from the fire alarm hiatus and proceeded with the examination of a witness, without Nucor expressing any sort of concern about the incident. If Nucor had brought the issue to the Court's attention, the Court could have questioned the jurors about what they saw and whether it might influence them, and could have given them an admonition to disregard the incident or, if warranted, could have granted a mistrial. As the record stands, there is no evidence that the jurors saw Howard being helped out of the building, nor, if they did see it, that they were influenced by it.

Nucor argues that the verdict itself demonstrates unfair prejudice because it is excessive. According to Nucor, the verdict exceeds the damages requested by Howard's lawyer in closing, which shows that it was the result of passion and prejudice. Howard's counsel asked the jury during closing arguments for past lost wages–$53,520; future lost wages–$65,400; medical expenses–$52,133.40; and pain and suffering–at least $200,000. The requested damages totaled $371,053.40. The jury awarded Howard $331,600. Nucor is mistaken in its argument that the jury awarded damages in an amount greater than requested in the plaintiff's closing argument. The verdict was not excessive.

**CONCLUSION**

For the foregoing reasons, Nucor's renewed motion for judgment as a matter of law, or in the alternative, a motion for a new trial is DENIED. Document #70.

IT IS SO ORDERED this 22nd day of February, 2016.

J. Leon Holmes

J. LEON HOLMES
UNITED STATES DISTRICT JUDGE